**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Secretary of Labor, United States Department of Labor, | No. CV-18-04756-PHX-GMS |
| Plaintiff, | **ORDER** |
| v. | |
| Valley Wide Plastering Construction Incorporated, et al., | |
| Defendants. | |

Pending before the Court is the Secretary of Labor's ("Plaintiff") Motion for Civil Contempt Sanctions (Doc. 187.)  For the reasons below, the Motion is granted in part.

## BACKGROUND

This case arises out of Defendants Valley Wide Plastering Construction Incorporated ("Valley Wide"), Jesus Guerrero, Rose Guerrero, and Jesse Guerrero, Jr.'s (collectively, "Defendants") alleged violations of the Fair Labor Standards Act ("FLSA"). Defendants operate Valley Wide, a construction company that provides plastering and stucco services.  In 2012 and 2017, the Wage and Hour Division ("WHD") of the United States Department of Labor investigated Defendants' compliance with the FLSA.  After WHD's second investigation, Plaintiff brought this lawsuit on December 18, 2018.  The Complaint alleges that Defendants have violated and continue to violate the FLSA by failing to pay overtime premiums, refusing to properly maintain records, and interfering with FLSA rights.

Since the beginning of this lawsuit, Plaintiff has alleged that Defendants continue to engage in conduct that violates the FLSA.  Accordingly, on October 16, 2020, Plaintiff filed a Motion for Preliminary Injunction to Restrain Violations of the FLSA to require Defendants to keep accurate records and pay overtime premiums as required by the FLSA. (Doc. 79.)  The Motion primarily argued that Defendants' piece-rate employees—those employees paid based on the number of yards worked rather than the number of hours— were regularly deprived of overtime wages due to the alteration of time records and lack of documentation of hours worked. (Doc. 79-1.)  The Court granted the injunction because Plaintiff was likely to succeed on his claim that Defendants had failed to keep required records, noting that there was substantial evidence that Defendants had "inaccurately recorded their employee work hours by filling in false hours or by manually altering the number of hours employees record without adequate justification." (Doc. 123 at 5.)  The injunction required that Defendants (1) stop maintaining false records; (2) implement a reliable timekeeping system "that employees may use to clock in at the start of the work day and out at the end of the work day"; (3) maintain accurate and complete records of wages paid, and to stop paying wages through non-payroll accounts; (4) stop listing false regular rates of pay on payroll records; (5) provide a Court-approved notice to employees with their paycheck and by mail; (6) provide all time and payroll records to Plaintiff; and (7) provide a list of all current employees with current contact information to Plaintiff every thirty days.  (Doc. 123 at 9–10.)

After the Court issued the injunction, Defendants purported to convert employees paid on a piece-rate basis to an hourly system.  Pursuant to the new system, Defendants trained Valley Wide superintendents on how time should be documented.  (Doc. 203-1 at 3.)  Employees were to (1) complete their own time sheet; (2) accurately document the time they worked, including the correct days of the week and times worked; (3) document their time contemporaneously as they worked it; and (4) total the number of hours worked at the end of the week, including by documenting any hours over forty in the box on the timesheet marked "Total O/T Hours."  (Doc. 203-1 at 3.)  After employees completed the

timesheet, they had to attest that (1) they did not suffer a work-related injury that week; (2) they took a lunch break every day worked; and (3) the hours reflected on the timesheet were correct. (Doc. 203-1 at 3.) The superintendents were then to collect the timesheets from the crew leaders at the end of the week, and if employees answered "no" to any of the questions, the superintendents were to follow up with the employees to ensure that the timesheet was accurate. Once the superintendents approved the timesheets, they were submitted to the payroll department. (Doc. 203-1 at 4.)

After the conversion to hourly wages, Valley Wide employees began documenting time using a paper and pencil system. Plaintiff had access to these raw timesheets and noticed discrepancies and other issues with this timekeeping system. First, Plaintiff noticed wide variations in individual employees' hourly rates and that employees' rates per yard after the conversion looked virtually identical to their former piece-rate. Second, some timesheets bore the wrong name and signature—in some instances resulting in employees not getting paid—and other timesheets had hours, and even whole days, erased. Plaintiff also noted that, based on his surveillance of Valley Wide jobsites, as many as twenty-one Valley Wide employees had not documented hours for time they had been observed working or their vehicles had been observed at Valley Wide jobsites. Plaintiff now alleges that Defendants have violated the preliminary injunction and requests civil contempt sanctions. (Doc. 187.)

An evidentiary hearing was held on March 29, 2022 and April 13, 2022, in which the Court heard testimony regarding Plaintiff's allegations. Francisco Arias, a Valley Wide superintendent, testified that supervisors were not often present on the jobsite at the beginning or the end of the day, that Valley Wide relied on their employees to fill out their own timesheets, that some employees were careless about filling out their timesheets, and that some filled out their timesheets all at once when he picked them up on Fridays. David Morris, a former Valley Wide employee, testified that he was instructed to, and usually would, fill out his timesheet for the following week on the same Friday that he received it.

At the contempt hearing, WHD investigators Becky Benitez and Mark DeBauge

testified that they monitored eighteen different crews in the Tucson area.  Of those eighteen crews, fifteen worked time on Saturdays that was not reported on their time sheets.  Ms. Benitez testified that after Plaintiff's contempt motion was filed, Valley Wide employees began documenting more Saturday time than they had prior to the filing.  The Court also heard testimony from Jesse "JR" Guerrero ("Mr. JR Guerrero"), Vice President of Valley Wide, who testified that the superintendents were instructed to train employees on how to contemporaneously document their time, and that the failure of an employee to do so was a violation of Valley Wide policy.

Teresa Carpio, Valley Wide's Office Manager, also testified about the transition from the piece-rate to hourly system.  She testified that Valley Wide intended to convert each employee to an hourly rate that would approximate their piece-rate earnings "so that they would stay on" as an employee.  Employees were also given bonuses if they worked efficiently on a given project.  Ms. Carpio denied that employees were instructed to fill out their timesheets in pencil and noted that she did not review timesheets to ensure the hours documented were accurate.

## DISCUSSION

## I. Substantial Compliance

Plaintiff contends that Defendants have violated the injunction in several ways.  First, Defendants continue to keep false records of hours worked by employees.  (Doc. 187-1 at 14.)  Second, Defendants have failed to implement a reliable timekeeping system for each employee to document their time.  (Doc. 187-1 at 13–14.)  Third, Defendants continue to list false regular rates for pieceworkers on payroll records.  (Doc. 187-1 at 14.)  And fourth, Defendants have failed to provide current contact information for all employees to Plaintiff.  (Doc. 187-1 at 14–15.)  The Court considers each argument in turn.

### A. Legal Standard

Civil contempt "consists of a party's disobedience to a specific and definite court order by failure to take all reasonable steps within the party's power to comply." *Go-Video, Inc. v. Motion Picture Ass'n (In re Dual-Deck Video Cassette Recorder Antitrust Litig.)*,

10 F.3d 693, 695 (9th Cir. 1993).  To establish civil contempt, the moving party must show by clear and convincing evidence that the defendant (1) violated a court order, (2) beyond substantial compliance, and (3) not based on a good faith and reasonable interpretation of the order.  *Labor/Cmty. Strategy Ctr. v. L.A. Cnty. Metro. Transp. Auth.*, 564 F.3d 1115, 1123 (9th Cir. 2009).  "'Substantial compliance' is a defense to civil contempt" when "there are a few minor violations despite the fact that 'every reasonable effort has been made to comply.'"  *Calvillo Manriquez v. DeVos*, 411 F. Supp. 3d 535, 539 (N.D. Cal. 2019) (quoting *In re Dual-Deck*, 10 F.3d at 695).  "The contempt 'need not be willful,'" but a party "should not be held in contempt if his action 'appears to be based on a good faith and reasonable interpretation of the [court's order].'"  *In re Dual-Deck*, 10 F.3d at 695 (quoting *Crystal Palace Gambling Hall v. Mark Twain Indus., Inc. (In re Crystal Palace, Inc.)*, 817 F.2d 1361, 1365 (9th Cir. 1987); *Vertex Distrib., Inc. v. Falcon Foam Plastics, Inc.*, 689 F.2d 885, 889 (9th Cir. 1982)).

"Clear and convincing evidence requires greater proof than preponderance of the evidence.  To meet this higher standard, a party must present sufficient evidence to produce 'in the ultimate factfinder an abiding conviction that the truth of its factual contentions are highly probable.'"  *Eaconomy, LLC v. Auvoria Prime, LLC*, 482 F. Supp. 3d 1030, 1033 (E.D. Cal. 2020) (quoting *Sophanthavong v. Palmateer*, 378 F.3d 859, 866–67 (9th Cir. 2004)).  "The Supreme Court has held that civil contempt 'should not be resorted to where there is a fair ground of doubt as to the wrongfulness of the defendant's conduct.'"  *Id.* (quoting *Taggart v. Lorenzen*, 139 S. Ct. 1795, 1801–02 (2019)).

**B.  Analysis**

**1.  Maintaining False Records and a Reliable Timekeeping System**

The preliminary injunction states that "Defendants are enjoined from maintaining false records of any of the information in records they are required to keep by law." (Doc. 123 at 9.)  It also requires that Defendants "implement a reliable timekeeping system for each employee to record his or her own daily start and stop times that employees may use to clock in at the start of the work day and out at the end of the work day." (Doc. 123 at

9.)  The FLSA requires employers to make and preserve records of employees' wages and hours for each workday and each workweek worked by its employees.  29 U.S.C. § 211; 29 C.F.R. § 516.2(a)(7).  The preliminary injunction, therefore, compels Defendants to ensure that employee time is documented, reliable, and an accurate representation of the actual time worked.  In support of his contempt claim, Plaintiff points to several pieces of evidence that allegedly show that Defendants maintain false records and an unreliable timekeeping system: (1) jobsite surveillance in which Valley Wide employees were observed working but did not document time; and (2) employee timesheets that either contained erasures, were suspiciously uniform, or were completed by the wrong employee.

### a.  Jobsite Surveillance

According to Ms. Benitez, Valley Wide records showed that most Valley Wide lath/plaster employees consistently worked forty or fewer hours per week.  (Doc. 187-2 at 5); (Doc. 187-8 at 8.)  Plaintiff conducted surveillance to determine whether this was an accurate representation of the hours actually worked by employees.  Ms. Benitez testified that, even though Valley Wide operated in Phoenix and Tucson, the surveillance occurred in Tucson because the Phoenix metro area was too large for efficient surveillance.  (March 29, 2022 and April 13, 2022 Transcript at Docs. 221 and 231 ("Tr.") Tr. at 124.)  Valley Wide employs approximately forty to fifty employees in Tucson at any one time.  (Tr. at 202.)  Mr. DeBauge testified that he began performing surveillance in July 2021.  (Tr. at 90.)  He surveilled approximately three times a week from July 2021 to approximately March 2022.  (Tr. at 90.)  Because Defendants did not provide Plaintiff with jobsite information in advance of the workweek, Mr. DeBauge depended on information from third parties to identify Valley Wide jobsites, and drove around approximately twenty-five residential sites in Tucson to try to identify and photograph Valley Wide employees and employee vehicles.  (Tr. at 90.)

Despite these limitations, Plaintiff uncovered twenty-one instances in which employees or employee vehicles[1] were personally observed at job sites without time being

---

[1] Some of these photos do not show employees actually engaging in work.  But Mr. Arias testified that employees begin and end their days at the assigned jobsites, (Tr. at 187-88,

recorded.  (Doc. 187-2 at 3); (Doc. 204-5 at 2.)  These twenty-one instances represented approximately fifteen Valley Wide lathing and plastering crews.  (Tr. at 129.)  On one day alone—October 23, 2021—six of the total crews were either observed working or had personal vehicles at Valley Wide jobsites.  (Pl. Exh. 64.)  As of March 2021—the last time Defendants provided Plaintiff with the number—there were approximately eighteen total lathing and plastering crews operating in Tucson.  (Tr. at 129.)  It seems, therefore, that nearly all of the total crews were observed working without having documented time, with some doing so on the same day.  Moreover, some employees did not record *any* time for these pay periods and thus did not receive a paycheck.  Geraldo Mejia was observed "cutting the rigid white foam and installing that," (Tr. at 98), a part of the lathing process, at a Valley Wide jobsite, yet did not receive a paycheck at all for the time period in question—or any time period after 2014.[2]  (Tr. at 54–55.)  Also troubling, Mr. DeBauge observed three workers as well as a vehicle at a Valley Wide jobsite on February 1, 2022.  That vehicle had been personally observed at the home of three Valley Wide employees: Ramon Pena, Jared Pineda, and Jason Avitia.  (Doc. 204-5 at 4–5.)  None of these employees received a paycheck or documented time for this pay period.  (Doc. 204-5 at 4-5.)  Entertaining the reasonable inference that the vehicle belonged to these three employees—and had been observed at other Valley Wide jobsites—it seems that despite having worked on February 1, 2022, these three Valley Wide employees received no paycheck whatsoever for this time period.

Defendants claim that some—though not all—of the instances of undocumented time have explanations.  (Doc. 203 at 15.)  Raymond Galarza states in his declaration that

192–93), and that they drive their own vehicles to and from those jobsites on each workday. (Tr. at 192–93.)  Although Valley Wide employees generally work on the exterior of the home, employees very well can be working on the opposite side of the house, not facing the street, and thus be out of view of a potential observer.  It is reasonable to infer that if a Valley Wide employee's vehicle is photographed at a jobsite, it means the vehicle's owner is working there.

[2] Maria Renteria disputes that Mr. Mejia performed work at this jobsite; instead, she stated that he "came along to keep [her] company."  (Doc. 203-14 at 3.)  Ms. Renteria was subpoenaed but did not appear for the evidentiary hearing and thus was not subject to cross-examination.  (Doc. 210-2 at 6–9); (Tr. at 158.)  Because Mr. DeBauge was subject to cross-examination, the Court credits his testimony.

(1) he has been paid for all the time he has worked; (2) he did not write down time for the Saturday in question because he "probably wrote down the time" on another day; and (3) he has never been instructed not to document time.  (Doc. 203-10 at 3.)  Christian Hernandez states in his declaration that (1) he did not write down hours for the Saturday in question "because I wrote down those hours on another day"; (2) he has been paid for all hours he has worked; and (3) he has never been instructed not to document time.  (Doc. 203-12 at 3.)  Even if this testimony is true, these employees violated the Court's injunction, and alleged Valley Wide policy: Mr. JR Guerrero testified that employees were not permitted to work on a specific day but write down the time on a different day.  (Tr. at 209.)  Maria Renteria also states in her declaration that (1) no one from Valley Wide instructed her to work on the Saturday in question; (2) she did not record her time because she did not consider what she was doing "work"; and (3) she has never been instructed not to document time.  (Doc. 203-14 at 3–4.)  It is not particularly credible under the circumstances for Ms. Renteria to state that what she was doing on a jobsite on a Saturday was not work.  But, even assuming that the employees' explanatory testimony is true, it still supports Plaintiff's position that Defendants' records did not accurately document employee hours for each workday and each workweek, as required by the FLSA and the preliminary injunction. (Doc. 123 at 9); 29 U.S.C. § 211; 29 C.F.R. § 516.2(a)(7).

The Court is also unpersuaded by Defendants' argument that the twenty-one instances are insufficient to show violations "beyond substantial compliance."  Although Mr. DeBauge frequently conducted surveillance—approximately 114 times over thirty-eight weeks—the twenty-one instances are still significant because Mr. DeBauge did not know where Valley Wide employees would be working in advance of the workweek. (Tr. at 90, 101.)  Moreover, most undocumented work was performed on Saturdays; if Valley Wide employees were regularly working Saturdays without documenting time, it stands to reason that the other two days per week that Mr. DeBauge spent surveilling would not have yielded many instances of undocumented time.  Considering that there is only one Saturday in a week, it is instructive to look at the number of instances of undocumented

Saturday time—seventeen—in comparison to the number of weeks surveilled—thirty-eight.  (Tr. at 101); (Pl. Exh. 64.)  The result is nearly 45%—more than enough to defeat any allegation of substantial compliance.   Even omitting the duplicative instances—counting Saturdays only once when more than one crew or employee vehicle was observed—the number is still particularly troubling: over 23% of the Saturdays surveilled resulted in the observance of either employees performing work or employee vehicles at jobsites with no documented hours.  These figures demonstrate that even though Mr. DeBauge had limited information and did not know where Valley Wide employees were working in advance of the workweek, he had a 23% chance of observing employees or employee vehicles without respective documented time on Saturdays.   This is not substantial compliance.

### b.  Employee Timesheets

Defendants' employee timesheets also demonstrate both that employees were not complying with the orders of the Court and not accurately documenting their time.  First, many timesheets contain unexplained erasures.  Second, the timesheets are inexplicably uniform.  And third, some timesheets have been filled out by an employee with a different name than is on the timesheet.

Plaintiff has provided eleven[3] timesheets for which documented time has been erased.  (Doc. 187-10.)  On nine of these timesheets, full or nearly full days of work have been erased.  (Doc. 187-10 at 3–7, 10–13.)  Approximately seven of these timesheets contain erased time that would have been overtime.  (Doc. 187-10 at 3, 8–11, 13–14.)  In addition to these, Mr. Jamail-Gutierrez, a WHD investigator, testified that there were "many dozens" of other timesheets with similar erasures.  (Tr. at 52.)  In support of their Response, Defendants have provided declarations from four employees whose timecards contained erasures.  All four employees state in their declarations that these erasures were made to correct errors and that no one at Valley Wide had instructed them to misrepresent

---

[3] The Court notes that several other timesheets included in Plaintiff's exhibits but not cited as being erased in the briefing also contain erasures.  (Doc. 187-2 at 8); (Doc. 187-3 at 23); (Doc. 187-6 at 32); (Doc. 204-2 at 5–6); (Pl. Exhs. 67, 68, 69.)

their hours.  (Docs. 203-7, 203-8, 203-9, 203-11.)  If, as Valley Wide asserts and as the preliminary injunction requires, the employees used the timesheets to document their time contemporaneously—"to clock in at the start of the work day and out at the end of the work day," (Doc. 123 at 9)—they would have no reason to erase *entire days* of work.  Perhaps a mistaken start or end time would be expected, or even a mistaken date.  But these employees did not merely "correct errors" by erasing days of work, many of which were overtime hours.  This evidence weighs heavily in Plaintiff's favor.

The timesheets in the record are also too uniform.  Defendants contend that employees were expected to fill out the timesheet "day by day"; they would document their hours as they were worked on a daily basis.  (Tr. at 164–65.)  But nearly all, if not all, of the timesheets in the record appear to have been filled out at the same time.  And the timesheets submitted as exhibits are all written in pencil, and there is no apparent variation in the pencil used to fill out each timesheet.  For example, Ms. Renteria's timesheet for August 21, 2021, (Doc. 187-5 at 3), shows that she worked exactly eight hours a day Monday through Friday, and she began and ended work precisely at the turn of the hour— rather than a few minutes before or after.  The pencil marks look identical in both her time entries and her name, which is printed six separate times on the timesheet.  And Ms. Renteria's timesheet is far from the only one suffering from this type of uniformity; Christian Hernandez, (Doc. 187-5 at 23); Gabriela Hernandez, (Doc. 187-5 at 24); Jesus Peralta Pena, (Doc. 187-3 at 23); and Martin Fuentes, (Doc. 204-7 at 3), also have timesheets in which the pencil strokes and handwriting appear as if the timesheet was filled out at the same time, rather than on different days.  Standing alone, this evidence may have merited only some weight; however, both Mr. Morris and Mr. Arias testified that some employees filled out their timesheets all at once, usually on Fridays when the superintendents would pick them up.  (Tr. at 27–28, 192.)  This testimony corroborates that many of the timesheets were not filled out on a contemporaneous basis, undermining their credibility and violating the preliminary injunction's requirement that time be documented contemporaneously.  This evidence weighs in Plaintiff's favor.

Finally, it appears that at least some employees were not filling out timesheets in their own accurate name. (Doc. 187-1 at 11.) For example, an employee named "Guiovany Hernandez Marroquin" signed his timesheet as "Guiovani Hernandex M." (Doc. 187-11 at 4.) Defendants explain this discrepancy by pointing out that the preprinted name on the timesheet is also misspelled. (Doc. 203 at 16.) Because "[Plaintiff] continually criticizes any correction made to time sheets," Mr. Marroquin was instructed to sign his name exactly as it was on the preprinted timesheet. (Doc. 203 at 16); (Doc. 203-16 at 3.) Yet, this explanation still violates the Court's injunction in that it directs an employee to fill out a printed timesheet for a name that is not accurately his or her own. Aside from the dubious proposition that Mr. Marroquin misspelled his own name, the Court will not credit Defendants' explanation for another reason: Plaintiff has produced seven timesheets for which the preprinted name does not match the signature. (Doc. 187-11 at 6, 8–12); (Doc. 204-4 at 34.) Worse, at least two employees were not paid for the pay periods documented by these timesheets.[4] (Doc. 187-8 at 11); (Doc. 187-11 at 6–19); (Doc. 204-1 at 9); (Doc. 204-4 at 34–35.) Even if the Court were to accept Defendants' explanation as true, it demonstrates that Defendants' timesheets are not accurate because employees are submitting time, and being paid, other than under their true name. This does not provide an accurate system in which time, hours, and payment can be verified. And, again, this evidence shows that Defendants' records are inaccurate and that the current system is not reliable.

### c. Reasonable Steps

Even with the above evidence, the Court cannot hold Defendants in contempt unless it finds that they have failed to take reasonable steps to comply with the preliminary injunction. *See Calvillo Manriquez*, 411 F. Supp. 3d at 539. To ensure compliance, Defendants held weekly meetings with the superintendents. (Tr. at 208–09, 219.) In these meetings, payroll was always the first topic of conversation, and Defendants emphasized

---

[4] Moreover, a Valley Wide foreman, Sergio Sotelo, appears to have signed off on his employees' timesheets but did not record any time himself for that pay period. (Doc. 204-1 at 9); (Doc. 204-4 at 28–32.)

that superintendents needed to remind employees to document their time daily. (Tr. at 208–09.) According to Mr. Arias, he tried his best to emphasize this to his employees; however, as noted by Mr. Arias, it is impossible for him—or any other superintendent—to be at every Valley Wide jobsite as employees arrive for work. (Tr. at 163–65, 167.) Other than these weekly meetings, there was no "checks and balances" system in place to ensure that employees were documenting their time accurately.[5] As noted by Ms. Carpio, even though she knew that many timesheets contained erasures, this would not have raised a "red flag" for her to investigate whether the timesheets were accurate. (Tr. at 288–90, 303-304.) Without back-end accountability, and ensuring that supervisors were actually adequately instructing and enforcing the directive concerning timesheets to their crews, merely telling their superintendents to tell the employees to fill out their timesheet contemporaneously and accurately is not "reasonable" in light of the requirements of the preliminary injunction. Even if such a step would be reasonable after implementation of the injunction, once timesheets began to show inexplicable erasures and uniformity, Defendants should have been alerted to take further steps to ensure compliance. They did not.

In consideration of all the evidence, the Court holds Defendants in contempt of paragraphs one and two of the preliminary injunction. Plaintiff's surveillance and the many erasures demonstrate that the timesheets were inaccurate, and the timesheets themselves— as corroborated by Mr. Morris's and Mr. Arias's testimony—demonstrate that employees were not contemporaneously documenting their time. Defendants have not shown that they have taken reasonable steps to ensure compliance with these paragraphs of the injunction, even after it became apparent that timesheets had been erased, were filled out in pencil, and appeared highly uniform. Defendants are in contempt of these paragraphs.

---

[5] Although Mr. Arias testified that he did check the timesheets, he also testified that he trusted employees to document their time correctly, occasionally did not check the timesheets, and could not be at every jobsite every day to ensure that the hours were accurate. (Tr. at 163, 168, 176–77, 189–90, 193–94.) Even if the Court credits Mr. Arias's testimony, his efforts are insufficient to demonstrate substantial compliance.

## 2. False Regular Rates

The preliminary injunction further enjoins Defendants "from listing false regular rates on payroll records." (Doc. 123 at 9.) The FLSA overtime regulations require that employers compensate employees at "not less than one and one-half times the regular rate" for all overtime hours worked. 29 C.F.R. § 778.107. For all employees—regardless of whether they are paid on a piece-rate or hourly basis—the "regular rate" is an hourly rate. § 778.109. "The regular hourly rate of pay of an employee is determined by dividing his total remuneration for employment (except statutory exclusions) in any workweek by the total number of hours actually worked by him in that workweek for which such compensation was paid." *Id.* The injunction, therefore, requires that payroll records show the accurate regular rate—the rate by which the overtime premium is calculated, or the hourly rate. §§ 778.110(a), 778.111(a).

Plaintiff argues that Defendants continue to pay some employees on a piece-rate basis despite Defendants' allegation that they transitioned to an hourly wage system. (Doc. 187-1 at 6–7.) According to Plaintiff, Defendants calculate the piece-rate wage for a given employee and then manipulate the employee's hours and hourly rate to approximate that piece-rate wage. (Doc. 187-1 at 6–7.) When this manipulation does not sufficiently approximate the piece-rate wage, Defendants use "bonuses" to ensure that the wages earned approximate or equal the piece-rate wage.[6] (Doc. 187-1 at 7.) Defendants contend that they do not manipulate the hours and hourly rates but instead have merely implemented hourly rates that tend to match the total piece-rate wage. (Doc. 203 at 4–5.) If, as Plaintiff contends, the employees *are* paid on a piece-rate basis, then those employees are entitled

---

[6] This type of scheme is described in the governing regulations:

> An employee is assigned an arbitrary hourly rate (usually the minimum) and it is agreed that his straight-time and overtime earnings will be computed on this rate but that if these earnings do not amount to the sum he would have earned had his earnings been computed on a piece-rate basis of "x" cents per piece, he will be paid the difference as a "bonus." The subterfuge does not serve to conceal the fact that this employee is actually compensated on a piece-rate basis, that there is no bonus and his regular rate is the quotient of piece-rate earnings divided by hours worked.

§ 778.502(d) (citation omitted).

to overtime wages *in addition to* their piece-rate wages for overtime hours worked in a week; that is, employees are entitled to both their gross piece-rate earnings and their regular rate multiplied by half and by the total number of overtime hours.  § 778.111.  In Plaintiff's view, by listing false regular rates—by representing employees as hourly instead of piece-rate—Defendants can avoid paying the correct overtime premium.  In support of this claim, Plaintiff points to (1) data from early March 2021 that shows that even after the conversion to hourly, employees continued to receive a consistent piece-rate based on the yards worked; (2) a timesheet of a Valley Wide employee with what appears to be a piece-rate calculation written on the back; (3) large differences in hourly rates for Valley Wide employees over successive weeks; and (4) Mr. Morris's testimony contending that he was paid by piece, not by hour.  The Court evaluates each in turn.

Data from early March 2021 shows that ten crews likely continued to be paid the piece-rate wage instead of the purported hourly rate immediately after the conversion to hourly.  (Doc. 187-8 at 4.)  Because Defendants stopped providing the total number of yards worked after early March, this time period is the only time period for which the piece-rate wage can be accurately calculated as compared to the hourly wage.  (Doc. 187-8 at 3-4.)  Defendants' payroll records show that the gross wages paid to these ten crews—approximately sixty-five employees—divided by the total number of yards worked, equal or closely approximate the piece-work rate of crews even after the conversion to hourly.  (Doc. 187-8 at 3–6); (Doc. 187-9 at 4–21); (Tr. at 34.)  For these ten crews—at least for the period for which there are records—they continued to earn exactly, or nearly exactly, the same amount per yard as they did before the conversion.  Defendants contend that this effect was intended: the hourly rate used to calculate an employee's gross earnings was designed to approximate the total piece-rate wage as much as possible.  (Doc. 203-2 at 3.)  Ms. Carpio testified that it was important that the hourly wages earned closely approximated the piece-rate earnings to ensure employees "would stay on as employees."  (Tr. at 257.)  It was expected that the hourly rate would fluctuate in the beginning because "they were either paying [employees] too much or too little."  (Tr. at 257.)  To determine

what constituted "too much or too little," employees were evaluated based on the budget for that particular project and how efficiently the work was performed.  (Tr. at 279–80, 300–01.)  The budget, however, was based on the number of yards per project, and for new employees whose productivity could not be calculated, the hourly rate was determined "once . . . they completed the home" and after "we would look at [the] budget."  (Tr. at 301.)

Although Defendants no longer provide the yards per project for Plaintiff to accurately approximate a piece-rate, Ms. Carpio's testimony indicates that Defendants' "productivity" calculation used to decide hourly rates is essentially a piece-rate calculation. If other factors were considered in assigning such rates—for example, years of experience—perhaps the issue would be a closer one.  Here, however, it seems that the hourly rate was a piece-rate; it was based on productivity, which was based on the budget, which was based on the yards per project.  Defendants have tried to demonstrate that there were other factors that came into the hourly rate decision, but all testimony on this issue was inconsistent, save for one issue: that hourly rates were based on productivity in relation to the budget—which relied on the yards needed to be worked.  Mr. Arias testified that he was not involved in setting employees' hourly rates because the foreman or crew leader, in coordination with the individual employees, would set the rates.  (Tr. at 180, 186.)  Mr. JR Guerrero testified that it was the employees, estimators, and supervisors (superintendents and crew leaders) who set the rates, but that Valley Wide also reviewed employees' production rates and compared them to their piece-rate when evaluating performance.  (Tr. at 230–32, 241.)  Mr. Carpio testified that Rose Guerrero, Mr. Jesus Guerrero, and Mr. JR Guerrero set the hourly rate for employees, and that the estimators were not involved in that decision.  (Tr. at 256.)  But both Mr. JR Guerrero and Ms. Carpio agreed that hourly rates were based on performance, which was measured based on the budget, and the budget was based on the yards per house.  (Tr. at 231–32, 298–99.)  This testimony weighs in Plaintiff's favor.

Other evidence of Defendants using false regular rates includes a timesheet of Felix

Sanchez, a Valley Wide employee.  Mr. Sanchez's timesheet for the week ending on December 10, 2021 shows that he worked a total of "26.45" hours.  (Doc. 187-9 at 23.)  On the back of the timesheet, there is a calculation in pencil which shows what appears to be the number of yards (388 and 426) multiplied by a piece rate (3.75) and which equals two numbers (1455 and 1597) that total 3,052.  (Doc. 187-9 at 23–24.)  Defendants' records confirm that Mr. Sanchez's crew, representing two employees, was paid a total of $3,052 for the prior pay period.  (Doc. 187-9 at 23–24); (Doc. 204-2 at 3–6.)  This evidence shows that Mr. Sanchez's crew was paid the equivalent of a piece-rate for those lots; it is more than mere coincidence that the crew was paid exactly the same—inclusive of bonuses—as the result of the calculation shown on the back of the timesheet.  Sammy Montijo testified that this calculation was merely the budget—based on the yards—for the house, (Doc. 203-4 at 3–4); however, this explanation does not address why Mr. Sanchez's crew received bonuses that caused their total earnings to exactly equal the budget—or the yards—for the house.  This evidence weighs in Plaintiff's favor.

After the transition to hourly, thirty-one Valley Wide employees experienced large hourly rate differences between weeks.  Some of these differences—only a week apart—were as much as 150%.  (Doc. 187-9 at 26.)  Mr. Jamail-Gutierrez testified that such differences in week-to-week pay rates are "not typical" for hourly employees.  (Doc. 187-8 at 8.)  As explained above, Defendants concede that the pay rates fluctuated after the conversion to hourly because Defendants were trying to best approximate the piece-rate wage; however, Defendants allege that the fluctuations stabilized over time, as shown by the hourly rates of these same employees through May 2021.  (Doc. 203-2 at 3–5); (Doc. 203-2 at 11.)  All thirty-one employees' hourly rates appear to have now stabilized to a consistent or mostly consistent rate.[7]  (Doc. 203-2 at 11.)  As noted by Mr. Jamail-Gutierrez, however, this does not necessarily mean that Valley Wide employees are paid on a straight hourly basis, because employee hours and "bonuses" can be manipulated to

---

[7] One employee, Candelario Ramirez, experienced weekly hourly rate differences through late April 2021.  (Doc. 187-8 at 8 (showing an hourly rate difference of $40 to $48 to $30 to $43.50 between weeks in April).)

artificially achieve the piece-rate wage. (Tr. at 48–49.)

The Court will give some weight to Plaintiff's evidence of "bonuses" based on the testimony of Ms. Carpio; however, all the bonuses Plaintiff specifically cites were from December 2021. (Doc. 187-8 at 6); (Doc. 187-9 at 15); (Doc. 204-2 at 3–4.) Even before the conversion, Valley Wide tended to give bonuses in December, as do many employers. (Doc. 187-8 at 5–6); (Doc. 204-1 at 3); (Tr. at 43.) Although Mr. Jamail-Gutierrez's testimony that the number of 2021 bonuses rose significantly from 2020—from fifty bonuses to over 450—the only ones specifically provided were from December. (Tr. at 42–43.) But there is some weight to this evidence given Ms. Carpio's testimony about when bonuses were given: bonuses were given to "fully compensate[]" an employee "for their production," with consideration of "the amount that was budgeted for [the] house." (Tr. at 260.) If there was money left over in the budget—which was based on the yards for the project—then employees could receive a bonus to recognize their productivity. (Tr. at 260.) This testimony, considered in conjunction with the Court's finding that employees' hours were inaccurate, weighs in Plaintiff's favor.

Because the Court has already determined—based on Plaintiff's surveillance, the witness testimony, and the employee timesheets—that Defendants have failed to maintain accurate records, this finding also supports that the regular rate listed on payroll documents is inaccurate. Historically, Valley Wide paid their lathing and plastering crews on a piece-rate basis without paying overtime. (Tr. 275–76, 363–65.) A continuing understanding that they were being paid on such a basis would explain the employees' failure to accurately keep or claim their time as set forth above.

Moreover, even if the employees are paid hourly, the documented hours must be accurate to determine an accurate regular rate of pay. The regular rate is calculated by dividing the total remuneration for employment by the total numbers of hours worked. 29 C.F.R. § 778.109. If the number of hours reported differs from the number of hours actually worked, the listed regular rate will be false. The fact that the documented hours are falsified, therefore, weighs in Plaintiff's favor.

Finally, some Valley Wide employees support Plaintiff's position that they were paid piece-rate, not hourly.  On July 10, 2021—five months after the transition to hourly—Valley Wide employee Jesus Peralta told a WHD investigator that he was paid on a piece-rate basis.  (Doc. 187-7 at 2.)  Likewise, on August 21, 2021, another Valley Wide employee informed an investigator that he was both paid by the yard and by hour, but that his hourly rate changed because he was only paid for forty hours a week.[8]  (Doc. 187-7 at 3.)  Yet another Valley Wide employee, Mr. Morris, also alleges that he was paid on a piece-rate basis after February 2021.  (Doc. 187-12 at 2.)  Mr. Morris claims that his supervisor, "Francisco," instructed him not to write more than forty hours on his timesheets to assure that his pay "would match the payment for the house."  (Doc. 187-12 at 2.)  Mr. Arias, Mr. Morris's supervisor, denies that he ever instructed any employee to improperly document their time.  (Doc. 203-5 at 3); (Tr. at 169–70.)  Given the volume of other evidence that also supports that employees were paid by piece, the Court will credit the employees' testimony that they were paid by piece for, at a minimum, a significant time after they supposedly switched to an hourly basis of pay.

Employee hourly rates differ dramatically across Valley Wide's workforce because the rates are based on productivity, and productivity is measured by an employee's ability to complete a certain number of yards in a given time period.  This is functionally piece-rate employment.  Payment by piece, however, does not necessarily violate the preliminary injunction; neither the injunction nor the FLSA requires an hourly wage system.  Instead, they require that payroll documents accurately reflect the regular rate: the rate by which the overtime premium is calculated.  If, as the Court has found, Defendants are paying by piece, and employees are failing to accurately document their hours, then the regular rates listed on payroll documents must be false, either because the hours documented are inaccurate, or because Defendants have used bonuses and varying hourly rates to fabricate a gross earning that equals the piece-rate earning.  Regardless, the regular rates must be accurate to properly calculate overtime, and to comply with the preliminary injunction.

---

[8] Defendants' hearsay objections are overruled because the parties stipulated to the Court's consideration of all declarations.  (Doc. 203 at 9 n.5); (Tr. at 158–60; 310–12.)

1  They are not.  The Court finds that Defendants are in contempt of paragraph four of the

2  preliminary injunction.

3  **3. Employee Contact Information**

4  Plaintiff finally contends that Defendants have failed to provide updated contact

5  information for Valley Wide employees, in violation of the preliminary injunction.  (Doc.

6  187-1 at 12.)  Plaintiff claims that (1) twenty-two of the phone numbers provided are out

7  of service or incorrect, (2) Plaintiff has received mail back as undelivered from eighteen of

8  the provided addresses, (Doc. 187-2 at 29–30), and (3) Defendants have failed "to

9  investigate this faulty information."  (Doc. 204 at 11.)  According to Defendants, the

10  information provided is as accurate as possible.  Defendants initially obtain employee

11  contact information from employment applications, (Doc. 203-2 at 7), which is updated

12  periodically under certain conditions.  First, employees are required to update their

13  addresses "whenever they move."  (Doc. 203-2 at 7–8.)  Second, phone numbers are

14  updated "when an employee requests to update his phone number."  (Doc. 203-2 at 8.)

15  Defendants also provide a change of address form to employees, and that form has been

16  circulated with their paychecks twice since November 2021.  (Tr. at 297.)  Because some

17  employees do not have a cell phone, and others share an address or cell phone, information

18  may overlap or simply be unavailable.  (Doc. 203-2 at 8.)  According to Defendants, every

19  time an employee updates their contact information with Valley Wide, Defendants disclose

20  that information to Plaintiff.  (Doc. 203-2 at 7–8.)

21  Defendants have reasonably complied with this paragraph of the preliminary

22  injunction.  The Court does not expect Defendants to conduct a monthly investigation into

23  their employees' contact information.  Although the preliminary injunction requires *some*

24  effort on Defendants' part to provide updated information, Defendants have met their

25  obligation by reminding employees to update their information and by occasionally

26  providing the change of address form to employees with their paychecks.  Unfortunately,

27  some employees may not update their information as often as would be preferable to the

28  parties.  But the Court cannot fault Defendants for inaccurate information when they have

1    taken reasonable steps to comply.  Plaintiff's Motion on this ground is denied.

2    **II.  Modification of Preliminary Injunction**

3           Plaintiff asks for modification of the preliminary injunction.[9]  (Doc. 187-1 at 17.)

4    "A district court has inherent authority to modify a preliminary injunction in consideration

5    of new facts." *A&M Recs., Inc. v. Napster, Inc.*, 284 F.3d 1091, 1098 (9th Cir. 2002).  "The

6    source of the power to modify is of course the fact that an injunction often requires

7    continuing supervision by the issuing court and always a continuing willingness to apply

8    its powers and processes on behalf of the party who obtained that equitable relief."

9    *Melendres v. Arpaio*, No. CV-07-2513-PHX-GMS, 2016 WL 3996453, at *4 (D. Ariz. July

10   26, 2016) (quoting *Sys. Fed'n No. 91, Ry. Emp. Dep't, AFL-CIO v. Wright*, 364 U.S. 642,

11   647 (1961)).  "A modification is appropriate when a court, faced with new facts, must make

12   a change 'to effectuate . . . the basic purpose of the original' injunction."  *Id.* (quoting

13   *Chrysler Corp. v. United States*, 316 U.S. 556, 562 (1942)).

14          Originally considered in light of "substantial evidence of recordkeeping violations,"

15   the preliminary injunction was intended to stop Defendants from engaging in a "continuing

16   failure to maintain accurate records, which greatly interferes with [Plaintiff's] and

17   employees' ability to determine the extent of wages owed, constitut[ing] serious damage."

18   (Doc. 123 at 7–10.)  Over a year later, Defendants continue to violate the FLSA.  Records

19   continue to be inaccurate because of undocumented time, failure to daily and

20   contemporaneously record time, unexplained erasures, and the listing of false regular rates

21   of pay on payroll documents.  The Court also notes with concern that Plaintiff has had to

22   conduct his investigation without full knowledge of Valley Wide's jobsites or the number

23   of yards per project.  Instead, Plaintiff has had to rely on limited information, and even then

---

24   [9] Plaintiff specifically requests that (1) Defendants be enjoined from instructing employees
25   to record or certify false hours on time records and, if Defendants continue to use a paper
     time system, for employees to use pen and explain any changes made; (2) Defendants be
26   enjoined from falsely recording the basis of employee pay on payroll records; (3) Plaintiff
     be permitted to provide training to Valley Wide employees on the recordkeeping provisions
27   of the FLSA, and for employees to be paid for said trainings; (4) Defendants be required
     to verify employee contact information; (5) Defendants comply with the provisions of the
28   original injunction, and (6) an independent monitor be appointed to audit the accuracy of
     Defendants' payroll and timekeeping records, or that Plaintiff be provided access to all
     relevant information so that he may do so.  (Doc. 187-13 at 2–3.)

has uncovered significant violations of the preliminary injunction. Because it has now been over a year since the preliminary injunction issued, yet Defendants continue to be out of compliance, the Court grants Plaintiff's modification, with some minor changes.[10] Most notably, the Court will require Defendants to provide more information to Plaintiff to ensure compliance, and Plaintiff will be permitted to train Valley Wide employees on the timekeeping requirements of the FLSA. The Court denies Plaintiff's request for monthly verification of employee contact information. However, Defendants shall provide a form for employees to update their contact information with their paychecks on a quarterly basis. (*See* Tr. at 268, 297.)

**III. Sanctions**

Plaintiff also asks for civil contempt sanctions. (Doc. 187-1 at 16.) "A court may wield its civil contempt powers for two separate and independent purposes: (1) 'to coerce the defendant into compliance with the court's order'; and (2) 'to compensate the complainant for losses sustained.'" *Shell Offshore Inc. v. Greenpeace, Inc.*, 815 F.3d 623, 629 (9th Cir. 2016) (quoting *United States v. United Mine Workers of Am.*, 330 U.S. 258, 303–04 (1947)). "Generally, the minimum sanction necessary to obtain compliance is to be imposed." *Whittaker Corp. v. Execuair Corp.*, 953 F.2d 510, 517 (9th Cir. 1992). "[I]f a sanction is designed to coerce, the court must, in determining the size and duration of the sanction, 'consider the character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired.'" *Id.* (quoting *United Mine Workers*, 330 U.S. at 304). "Those sanctions which are designed to coerce compliance are by their very nature "'conditional' sanctions; they only operate if and when the person found in contempt violates the order in the future.'" *Id.* (quoting *In re Magwood*, 785 F.2d 1077, 1082 (D.C. Cir. 1986)). "If a

---

[10] Specifically, the Court defers ruling on Plaintiff's request for an independent monitor at this time. The Court will consult with the parties before issuing such a ruling. As with the coercive sanctions discussed below, the Court wishes to discuss with the parties: (1) the functions of the proposed monitor; (2) the potential time commitment and cost of any proposed monitor; (3) whether there are any conditions under which Defendants should not bear such costs; and (4) to the extent the parties are aware, the financial circumstances of Defendants.

1   sanction operates whether or not a party remains in violation of the court order, it does not

2   coerce compliance." *Id.*

3   **A.  Coercive Sanctions**

4   Plaintiff requests three coercive sanctions: (1) If Defendants continue to keep false

5   records of hours, that the Court order Defendants to pay a fine of $10,000 to the Court for

6   each employee and each workweek affected; (2) If Defendants continue to falsify the

7   regular rates of pay or basis of pay, that Defendants pay a fine of $10,000 to the Court for

8   each employee and each workweek affected; and (3) If Defendants continue to violate any

9   other provision of the preliminary injunction, that Defendants pay a fine of $10,000 to the

10   Court for each violation and each workweek in which it occurred.  (Doc. 187-13 at 2.)

11   To the extent the Court is inclined to enter a coercive sanction, Plaintiff has failed

12   to suggest (1) a mechanism by which such violations might be determined, or (2) whether

13   imposition of a fixed amount for any violation violates the substantial compliance standard.

14   Further, the Court is inclined to hear from the parties on what might be an amount per

15   violation that would serve the purposes of a coercive sanction in light of any realistic

16   assessment of Defendants' financial circumstances.  Prior to entering any such coercive

17   sanction(s), the Court will further consult with the parties.

18   **B.  Remedial Sanctions**

19   Plaintiff does not request that any employee be reimbursed for work or overtime

20   work that went unpaid, nor has Plaintiff provided evidence from which the Court could

21   base such a calculation.  Plaintiff has asked, however, for an award of reasonable attorneys'

22   fees and costs incurred by investigating Defendants' contempt and filing the Motion for

23   Sanctions.  (Doc. 187-1 at 17.)  To the extent that Plaintiff can establish that attorney time

24   was incurred because of Defendants' violation of the preliminary injunction—for example,

25   time spent in the preparation of this Motion—the Court will award attorneys' fees.  As for

26   investigative costs, Plaintiff may recover costs for his Saturday surveillance and time spent

27   reviewing the timesheets to identify evidence in support of the Motion.  As a further

28   remedial sanction, Defendants will also compensate Plaintiff for the time spent educating

employees on the timekeeping requirements of the FLSA, as required by this Order.  The Court will determine the total amount of fees upon a later application by Plaintiff.

## CONCLUSION

Plaintiff has shown that Defendants have failed to substantially comply with the preliminary injunction.  Specifically, Defendants continue to (1) maintain false records; (2) fail to maintain a reliable timekeeping system; and (3) provide false regular rates of pay on payroll records.  Because Defendants are out of compliance, the Court grants Plaintiff's Motion in part and orders the appropriate sanctions.

**IT IS HEREBY ORDERED** that Plaintiff's Motion for Civil Contempt Sanctions (Doc. 187) is **GRANTED** in part and **DENIED** in part.  It is granted in part as to Defendants' maintaining of false records, their failure to maintain a reliable timekeeping system, and their provision of false regular rates on payroll records.  The Motion is denied on all other grounds not specifically held in abeyance pending an additional hearing.

**IT IS FURTHER ORDERED** that Plaintiff's requests for the appointment of a monitor and/or for a coercive fine are **DEFERRED** until further consultation with the parties.

**IT IS FURTHER ORDERED** that Plaintiff's request for an award of reasonable attorneys' fees and investigative costs incurred by Defendants' violation of the preliminary injunction is **GRANTED**.  Investigative costs shall be limited to Saturday surveillance and time spent reviewing the timesheets to identify evidence in support of the Motion for Civil Contempt Sanctions (Doc. 187).  The Court will determine the fee award after Plaintiff submits an application for reasonable attorneys' fees and investigative costs.  Plaintiff shall have 14 days from the date of this Order to submit this application.

**IT IS FURTHER ORDERED** that Plaintiff shall e-mail to the Court and opposing counsel an Excel spreadsheet containing an itemized statement of hours expended and fees requested for all legal and investigative services related to Defendants' contempt within 14 days from the date of this Order.  This spreadsheet shall be organized with rows and columns and shall automatically total the amount of fees and costs requested to enable the

Court to efficiently review and recompute, if needed, the total amount of any award. Defendants shall then e-mail to the Court and opposing counsel a copy of Plaintiff's spreadsheet, adding any objections to each contested billing entry (next to each row, in an additional column) so as to enable the Court to efficiently review the objections. Defendants shall email the completed spreadsheet to the Court and opposing counsel within 14 days from the receipt of Plaintiff's spreadsheet.

**IT IS FURTHER ORDERED** that the February 5, 2021 preliminary injunction (Doc. 123) is hereby modified.  In addition to the provisions in that order, the Court enjoins Defendants, including their agents, family members, or officers, owners, or directors, and all those in active concert or participation with Defendants, as follows:

1. Defendants are enjoined not to instruct employees to record or certify false hours on time records.  If Defendants continue to use paper time records, Defendants shall ensure that each employee keeps a contemporaneous record of his or her own daily start and stop times when he or she begins and ends work each workday using pen.  If any changes are made to hours recorded by employees, Defendants shall provide Plaintiff with a written description of the change and the reason for each change.

2. Defendants are enjoined from falsely recording the basis of employee pay on payroll records.  Defendants are enjoined from requiring employees to falsely certify in any fashion that they are paid on an hourly basis when they are not.

3. Within 30 days of this Order, Defendants shall arrange for representatives of the Wage and Hour Division and the Solicitor's Office, U.S. Department of Labor to meet with all Valley Wide employees to inform them of this Order and to provide training on the recordkeeping provisions of the FLSA.  The training shall be specifically limited to this Order, the modified preliminary injunction and its requirements, and the recordkeeping provisions of the FLSA.  Each individual Defendant and all superintendents are enjoined to attend.  Defendants shall compensate all employees for time spent at these meetings.  Defendants shall

also reimburse Plaintiff for costs incurred because of this training.

4.  On a quarterly basis, Defendants shall provide a form to all of their employees, with their paychecks, so that employees may update their contact information with Valley Wide.  Defendants shall provide the updated contact information, if any, to Plaintiff every month with the current employee roster.

5.  Defendants shall comply with all other provisions of the February 5, 2021 preliminary injunction (Doc. 123).

6.  Before the start of each workweek, Defendants shall produce to Plaintiff a list of the addresses and/or lot numbers and subdivisions of all anticipated job sites where Valley Wide employees will work and the type of work to be performed at each jobsite.

7.  In addition to time and payroll records, Defendants shall provide Plaintiff the following information for each pay period: (1) the lot numbers/subdivisions or addresses of all jobsites where employees worked and the dates on which they worked at each jobsite; (2) the type of work performed by employees at each jobsite; (3) the yards or other units of work completed by employees at each jobsite; (4) the gross wages paid for each job completed and the rate of pay per yard or unit of work; and (5) the crews on which employees worked.

8.  To the extent any documents or information that Defendants provide to Plaintiff exist in a structured database system (such as accounting systems, payroll systems, people management systems, and time management systems), the data shall be extracted and produced in an electronic format that can be easily interpreted and used by Plaintiff, such as an Excel spreadsheet.

**IT IS FURTHER ORDERED** setting a follow-up conference on Friday, **May 13, 2022 at 2:30 p.m.** in Courtroom 601, Sandra Day O'Connor U.S. Federal Courthouse, 401 West Washington Street, Phoenix, Arizona 85003-2151.  Out-of-state counsel may appear telephonically and shall disseminate the conference call-in number to the Court on or before **Noon on May, 10, 2022**.  In-state counsel shall appear in person.

**IT IS FURTHER ORDERED** that the parties shall be prepared to discuss the following:

1.      Special relief matters discussed in this Order.

2.      Plaintiff's requests for the appointment of a monitor and/or for a coercive fine including (1) the functions of the proposed monitor; (2) the potential time commitment and cost of any proposed monitor; (3) whether there are any conditions under which Defendants should not bear such costs; and (4) to the extent the parties are aware, the financial circumstances of Defendants.

Dated this 5th day of May, 2022.

G. Murray Snow
Chief United States District Judge